B. G. MITCHELL, ET AL, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Mitchell v. Commissioner
Docket Nos. 611-70, 1340-70.
United States Tax Court
T.C. Memo 1973-73; 1973 Tax Ct. Memo LEXIS 212; 32 T.C.M. (CCH) 308; T.C.M. (RIA) 73073; March 29, 1973, Filed *212 William H. D. Fones, for the petitioners. Vallie C. Brooks, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION
HALL, Judge: Respondent determined the following deficiencies for the following years: Petitioner
Year
Deficiency
B. G. Mitchell
1964
$ 4,190.51
1965
2,395.27
1966
17,489.43
H. S. and Alma Mitchell
1961
$ 923.66
1964
7,190.77
1965
12,352.47
1966
757.59 la The sole issue for our determination is whether the gain from the sale of two tracts of land is properly includible in petitioner B. G. Mitchell's income as contended by the respondent, or is includible in the 2 income of his father, as argued by the petitioner. [2] If we find that the gain is properly includible in petitioner's income for 1966, respondent concedes that petitioner's father and mother are entitled to increase the net loss reported on their 1966 joint return by $58,252.50. *213 FINDINGS OF FACT Some of the facts have been stipulated, and are so found. Petitioner, B. G. Mitchell, resided in Memphis, Tennessee, at the time this petition was filed. He and his then wife, Mary S. Mitchell, filed a joint 1966 Federal income tax return with the district director of internal revenue at Nashville, Tennessee. Petitioner was approximately 39 years of age at the time of the transaction in question and has conducted an active practice as an orthopedic surgeon in Memphis, Tennessee since 1950. Petitioner's father is a farmer, merchant and contractor, and was approximately 67 years old at the time of the transaction 3 in question. He has purchased numerous real properties during his lifetime, and has retained most of them. In 1961 petitioner was looking for an investment in real property. He was advised by a friend, Charles Neely, that the J. W. Moore Estate properties located near Rosemark, Tennessee, would be sold under the supervision of the Chancery Court of Shelby County, Tennessee. Neely, an attorney, advised petitioner that he (Neely) represented the Moore Estate and in such capacity was handling the sale of the properties, and that he would *214 like to see petitioner acquire them. The properties consisted of five tracts of land located near Memphis, Tennessee, as follows: (1) One tract, consisting of approximately 350 acres, located 9 miles north of the community of Raleigh. Raleigh is adjacent to the City of Memphis in a rapidly developing area of Shelby County. (2) Two tracts, consisting of a house and four acres together with 84 adjoining acres, located in the community of Rosemark. (3) Two tracts, consisting of about 233 acres, surrounding the Memphis Cattle Feeders' property, located 3 or 4 miles from Tennessee Highway 14 in a farming area. Petitioner's father was very familiar with the Moore Estate properties and was anxious to have his son obtain the entire properties. However, petitioner was not able to 4 finance the entire purchase at that time. As a result, the father agreed to help petitioner finance the property. The father negotiated a purchase price of $196,000 with Neely for the entire Moore Estate properties. At the time he was negotiating with Neely, the father was approached by one Keltnor, who was associated with the Memphis Cattle Feeders, and who asked the father to let the Memphis *215 Cattle Feeders acquire the two tracts next to the Memphis Cattle Feeders' property. At the time of the purchase from the Moore Estate, petitioner was well aware that Memphis Cattle Feeders was interested in these two tracts. On November 7, 1961, the Chancery Court of Shelby County approved the sale of the Moore Estate properties in a court decree which reads in part as follows: It will be further shown from the testimony of the witnesses that Dr. Billy Gwinn Mitchell and his father, H. S. Mitchell, appeared in open court and testified that they had agreed to pay $196,000.00 in cash for all the property and that the growing crops were not included in the said sale price. It was further understood that the taxes for the year 1961 would be borne by the estate of the said J. W. Moore and that the costs of the abstracts would also be borne by the said J. W. Moore's estate. From the testimony of all the witnesses, the Court was of the opinion that the sale was an advantageous one to all the parties concerned and especially as to the minors, and it was further stated that the said purchasers would pay into the coffers of the Court the sum of $60,000.00 and pay the remainder of the *216 purchase price on or about the 18th day of December, 1961, at which time a decree would be entered divesting the title from the heirs of the said J. W. Moore and vesting it in Dr. Billy Gwinn Mitchell or H. S. Mitchell or any one they might designate. 5 A decree of the Chancery Court vesting title to the five tracts of the Moore Estate in petitioner was entered on March 12, 1962. That decree reads in part as follows: It is therefore ORDERED, ADJUDGED AND DECREED by the Court that all the right, title and interest of all parties to this cause in and to said tracts of land be, and the same is, hereby divested out of them, and each of them, and vested in said Billy Gwinn Mitchell, as an indefeasible inheritance in fee simple forever, free from all encumbrances except 1962 County taxes, which are not due or payable. The decree was recorded in the Register's Office of Shelby County, Tennessee. The purchase price of $196,000 came from the following sources: 1. $54,000 from the father. The father obtained this money by withdrawing about $51,500 from the L & W Construction Company, a partnership of which he was a 50% partner, and by obtaining a $4,000 personal loan from *217 the Union Planters National Bank in Memphis. 2. $142,000 from petitioner. This represents (a) the $42,000 proceeds of a loan by petitioner from the First National Bank of Memphis on a short-term note, and (b) the $100,000 proceeds of a loan from Equitable Life Assurance Society to petitioner on a promissory note (signed by petitioner, his wife and his father) secured by deed of trust on all the purchased property (signed by petitioner and his wife). In order to obtain the $42,000 loan, petitioner supplied 6 the Bank with information concerning the reason for the loan. In the regular course of its business, the Bank prepared and furnished to its Discount Committee the follwing statement regarding the loan, based on statements made to it by petitioner: Dr. Billy G. Mitchell has been our satisfactory customer since manhood. In the past we have loaned him up to $5,000 on an unsecured basis with satisfactory experience.At present $3,000 is owing unsecured. Yesterday Dr. Mitchell was in and requested a loan of $42,000 for ninety days to be used as part purchase price on 65 acres of land located near Rosemark, Tennessee, costing $196,000. Equitable Life Assurance Society *218 of the U.S. has committed to make a $100,000 first mortgage loan on this property. Dr. Mitchell is getting $54,000 in cash from his father as part purchase price with the remaining $42,000 being requested from us. Within the ninety day period Dr. Mitchell is to liquidate Investors Syndicate contract and apply $8,000 on the debt, thereby reducing it to $34,000. His father plans to sell, within a ninety day period, certain real estate located in the City of Memphis, give the money to his son for the purpose of retiring our remaining $34,000 debt within the ninety day term. If, however, the property is not sold and debt paid at the end of ninety days, then we have been offered as security for the remaining $34,000, a first mortgage on a small shopping center located approximately 1-1/2 miles east of Millington on Navy Road. * * * Certainly this property is valuable enough to support our $34,000 permanent five-year monthly pay loan if it is not retired at the previously mentioned ninety day period. The real estate belongs to Dr. Mitchell's father, H. S. Mitchell, and he has also signed our note. Dr. Mitchell's financial statement indicates a net worth of $221,000 with debts of *219 $16,000. His income before taxes is $30,000 annually. Principal assets are real estate and his only debts are mortgages on real estate. 7 Based on our usual satisfactory experience, Dr. Mitchell's net worth and his earning ability, our alternative security and liquidation we have committed to extend this credit as outlined above. Petitioner made the following payments on the $42,000 loan: $12,000 principal on July 5, 1962; $5,000 principal on October 2, 1962; $5,250, representing $5,000 principal and $250 interest on December 3, 1962; and $2,273, representing $2,000 principal and $273 interest, on December 3, 1963. Petitioner paid the balance owing on the loan in 1971. Petitioner was authorized to write checks on his father's checking account. He wrote the following checks, payable to himself, on his father's account: $5,000 on October 2, 1962; $12,159 on October 10, 1962; $5,250 on December 3, 1962; and $2,273 on December 3, 1963. Petitioner represented that he owned the entire Moore Estate properties in a financial statement which he submitted to the First National Bank of Memphis on June 3, 1963. Petitioner again represented that he owned the entire Moore Estate *220 properties in another financial statement which he submitted to the First National Bank of Memphis on September 29, 1965. On his Federal income tax return for the year 1965, petitioner claimed a deduction for interest in the amount of $5,292.98 paid to Equitable Life Assurance Society, being the total interest paid in 1965 on the $100,000 loan. On his 1966 Federal income tax return, petitioner claimed a deduction for 8 interest in the amount of $5,000.25 paid to Equitable on the loan, being the total interest paid thereon in 1966. A few years after the 1962 purchase of the Moore Estate properties, petitioner was approached by a representative of MemphisCattle Feeders who inquired about buying the two tracts of land surrounding the Memphis Cattle Feeders' property. The representative reminded petitioner that before the property had been sold under the supervision of the Chancery Court, the representative had discussed the purchase of the property with his father. Petitioner referred the representative to his father, and in the early part of 1966, Jim Tune, representing Memphis Cattle Feeders, approached petitioner's father about purchasing the two tracts surrounding the *221 Memphis Cattle Feeders' property. On March 7, 1966, petitioner's father drafted, executed and delivered to Jim Tune an option, "good until midnight March 16, 1966," for the purchase of the two tracts of land. The option stated that Memphis Cattle Feeders would not get any cotton allotment on the land, would pay all taxes for 1966, and that the purchase price would be $550 per acre. On March 16, 1966, Memphis Cattle Feeders exercised the option. On that same day Memphis Cattle Feeders executed a sales agreement which recited that the petitioner would sell and Memphis Cattle Feeders would buy the two tracts of land for a total purchase price of $128,034.50. The contract was 9 signed "B. G. Mitchell [petitioner] by H. S. Mitchell [father]." The father acted as petitioner's agent in signing the contract. On April 21, 1966, petitioner and his wife executed and delivered a warranty deed whereby they conveyed the two tracts of land to Memphis Cattle Feeders. A title company settlement sheet, showing May 16, 1966 as the closing date, names petitioner as "seller", does not refer to the father, and shows the net proceeds of $48,047.30 as going to the seller, petitioner. The *222 settlement sheet also showed $24,000 paid to Equitable Life Assurance Society for a partial release of the mortgage held by Equitable as security for its $100,000 loan to petitioner. The father received the earnest money ($55,000) from the sale of the two tracts but is unsure what he did with it. The check for the net proceeds ($48,047.30) was endorsed over to the father by petitioner, and the father deposited it to his account in the L & M Construction Company. The father stated that he didn't keep any record of loans and gifts to his son, and that he felt whatever belonged to him also belonged to his son, the petitioner. Sale of the two tracts was not disclosed on the 1966 return of petitioner and his then wife. However, it was reported on his father's return as ordinary farm income from Mitchell Farms as follows (relevant entries in brackets): 10 Schedule J - Mitchell Farms
Income
Sales
$77,372.90
Rentals
1,971.15
[Land Sales
128,155.50]
Government Subsidy Payments
55,567.43
$263,066.98
Cost of Sales
Inventory, 1/1/66
$35,252.04
Rent
11,050.46
Labor - Cotton Picking & Chopping
3,982.68
Seed, Feed & Fertilizer
25,896.73
[Cost of Land Sold
69,903.00 ]
Total
$146,084.91
Less Inventory 12/31/66
63,543.16
82,541.75
Gross Profit
$180,525.23
*223 The father's 1966 return showed a net operating loss of $125,621.23, after reporting the income from the sale of the two tracts, and no tax was payable thereon. Revenue Agent Glenn Fuller examined petitioner's and his father's 1966 income tax returns. In an interview on August 30, 1967, in the father's office at Millington Supply Company during the audit of such returns, the father told Fuller that petitioner had purchased all the land from the Moore Estate for approximately $196,000; that they had borrowed $140,000 [sic] and he (the father) had put up the balance of $54,000; that subsequent to the purchase he (the father) had farmed the part of the land that could be farmed; and that he had made some payments on the mortgage and was not certain that such 11 payments had been charged against his son, but he thought his accountant, Grover Bass, could clear up the matter. The father further advised Fuller that about a year after the purchase his son told him that he (the father) could buy from the son a portion of the land for what had initially been paid for the property. In response to Fuller's inquiry whether the father knew about the details of the sale to the Memphis *224 Cattle Feeders before it took place, the father said that his son had told him he (the son) was not going to pay any tax on the sale or any of the expenses, but that he would sell the property to his father for just what he had in it.The father stated to Fuller that the agreement between him and petitioner, which he stated was entered into about a year after the purchase, was an oral understanding between him and his son and there was no written agreement. At one of the closing conferences held in the audit of the returns of petitioner and his father, Grover Bass, accountant for petitioner and his father, gave Revenue Agent Fuller for the first time a copy of the following purported Sales Agreement which was typed on Millington Supply Company stationery: January 9, 1965 SALES AGREEMENT ON LAND I hereby agree as of this date to sell to H. S. Mitchell 214 acres on Brunswick Road and 18 acres on Rosemark-Kerrville Road for the sum of 12 $300.00 per acre which was the cost of this land at the time that it was purchased. I further agree to convey said property to anyone that he might sell to. It is further agreed that the purchaser will pay all expense in closing this *225 sale. /s/ B. G. Mitchell, M.D. Dr. B. G. Mitchell /s/ H. S. Mitchell H. S. Mitchell This document was never recorded. No payment for the acreage in question was made by the father to the son. During Revenue Agent Fuller's audit of the returns of petitioner and his father, the bookkeeper for the father advised Fuller that there was an account receivable on the books of Millington Supply Company for petitioner. Neither the father's bookkeeper nor the accountant, Grover Bass, could locate the original ledger sheet. However, a transcript of a portion of the entries to that account was found in Bass' work papers. One entry on the sheet, dated December 31, 1966, refers to the two tracts of property sold to Memphis Cattle Feeders as having belonged to the petitioner at the time of the sale by use of the words "233.01 acres of Dr. B. G. Mitchell's land sold by H. S. Mitchell dated 1-15-65 to Mfs. Cattle Feeders Inc. * * *." ULTIMATE FINDING OF FACT The land sold to the Memphis Cattle Feeders, Inc., in 1966 was the property of, and was sold by, petitioner as principal, 13 and not his father. OPINION Petitioner contends that his father owned the two tracts of *226 land sold to the Memphis Cattle Feeders at the time of the sale. Respondent contends that it was the petitioner who owned the land at the time of the sale, and therefore petitioner who is taxable on the gain therefrom. We agree with respondent. The facts in this case, which are set out in the findings of fact above, show that petitioner and his father intended that petitioner acquire the five tracts of property offered for sale by the Moore Estate, that petitioner did buy such properties in 1962 with the help of either loans or gifts from his father, and that he still owned them at the time of the sale. We were not persuaded by petitioner's assertions to the contrary. Petitioner claimed that the representatives of the Moore Estate insisted upon selling all the realty to only one individual, but the Chancery Court's decree approving the sale is clear that title could have been issued either to petitioner or his father in any form they desired. Petitioner in fact took title. Petitioner also points to the fact that the father advanced $54,000 of the purchase price, advanced sums to repay part of petitioner's $42,000 loan, and received the proceeds of the sale of the two tracts *227 of land. Money moved 14 between petitioner and his father constantly, and petitioner was entitled to write checks on his father's account. The record is clear that the father was willing to give his son whatever he wanted, and considered that whatever belonged to him also belonged to petitioner, his only son. Petitioner stressed the fact that the father negotiated both the original purchase of the Moore Estate properties and the sale of the two tracts of land to Memphis Cattle Feeders. The entire record shows that the father acted as petitioner's agent in both these negotiations. Finally, petitioner points to an unrecorded purported Sales Agreement between petitioner and his father dated January 9, 1965, as proof that the father owned the two tracts sold in 1966. The circumstances surrounding the production of the document, the father's prior denial of its existence, the allegation that (even though not recorded) it was executed to get the property out of the petitioner's estate in view of his marital difficulties, the petitioner's inclusion of the property as his in his financial statement prepared and submitted to the bank eight months after the date of the purported *228 Sales Agreement, and the petitioner's accountant's notation in 1966 showing the land as petitioner's, together with all the surrounding circumstances, including the unorthodox treatment of the transaction on the father's return and the father's substantial net operating loss, all make it impossible for us 15 to hold that the petitioner has met his burden of proof as to the document's authenticity. The looseness with which intra-family transactions between father and son were documented and the apparent freedom and informality with which money and property flowed back and forth, in a context where the father considered whatever belonged to him also belonged to the son, has led to a very confused record, replete with facts from which contradictory inferences could be drawn. The lack of clear documentation, however, is a defect of petitioner's own making. Petitioner held record title to the property in question at all relevant times, represented to third parties (the bank) that it was his, claimed full deductions for interest paid on the note secured by a trust deed on the property and took no steps to properly formalize or record the alleged transfer to his father. In view *229 of the father's relatively advanced age it may well have been considered more desirable from an estate planning viewpoint to preserve the son's record ownership. When the opposite strategy became dictated for income tax purposes (the father having a substantial tax loss), it then best suited the petitioner's interest to treat the property and the gain as the father's. The respondent, whose determinations are entitled to a presumption of correctness, has determined that the property belonged to petitioner beneficially (as well as of record) and 16 that the gain was his. Based on the entire record, we find ourselves unable to hold that petitioner has successfully met his burden of proof to the contrary. We have found as a fact that the petitioner owned the two tracts of land sold to the Memphis Cattle Feeders, and it therefore follows that petitioner is taxable on the gain realized from the sale.
Decisions will be entered under Rule 50. Footnotes
1. Consolidated herewith for trial, briefing and opinion is the case of H. S. Mitchell and Alma Mitchell, Docket No. 1340-70. ↩
2. In the case of B. G. Mitchell (docket No. 611-70), the parties have reached an agreement on all other adjustments set forth in the statutory notice. In the case of H. S. Mitchell and Alma Mitchell (docket No. 1340-70), the parties have reached an agreement on all adjustments set forth in the statutory notice except that the outcome in docket No. 611-70 will affect the amount of loss incurred by the petitioners in docket No. 1340-70. For purposes of this opinion B. G. Mitchell will be referred to as "petitioner" or "son", and H. S. Mitchell and Alma Mitchell will be referred to as "father" and "mother", respectively. ↩